Good morning, Your Honors. May it please the Court. My name is Sharon Parker, and I am pro bono counsel for Khalil-Salim Arbid. Your Honors, this case involves a Lebanese Christian in which the B Board of Immigration Appeals did not provide any analysis whatsoever in holding that he was guilty of a particular serious crime for immigration purposes. In this Court's recent holding of Delgado v. Holder, this Court remanded a similar BIA decision which said, based on the record before us, we agree with the immigration judge that the respondent is subject to removal. In Delgado, similar as in this matter, the BIA did not provide any analysis or any reasoning whatsoever in holding that the respondent was guilty of the particularly serious crime. Didn't the IJ look at various documents from the criminal case in making that determination which the Board upheld? The immigration judge in our case did look at documents, including the pre-sentence report, the guilty plea, the statement of facts. However, from Delgado, the Board of Immigration Appeals also needs to provide some basis in its decision as to why it is upholding the immigration judge's decision. Why can't it just look at the record that was before the immigration judge and say, we agree? I'm not sure I understand what the purpose of the remand is, other than to have the Board redo what the IJ has already done. Because this Court needs the opportunity to review the Board of Immigration Appeals' decision and make sure that the decision is right. The audience's question is to the extent of the conviction, the sentence imposed, and the circumstances and underlying facts of the conviction, and citing cases and transcript, considering the nature and the scope of the crime, we don't find an error. So why isn't that sufficient reasoning for us to review the propriety of the decision? The Petitioner submits that simply concluding that considering the nature and the scope of the crime does not provide an adequate explanation as to the nature and scope of the crime. Well, there's a footnote that talks about the complex scheme attempting to defraud victims of about $2 million in which he actually gained an exact dollar figure. I guess I don't see the absence of reasoning here. The BIA decision, again, goes into no detail regarding this quote-unquote scheme to which Mr. Arbid was purportedly a part of. And regarding the $1 million versus the $300,000, it just provides no detail as to what was actually going on there. But he can't relitigate that, can he, because he's pled guilty to it? And if the I.J. is looking at the indictment and various judicially noticeable documents from the criminal case, he's essentially in law, collaterally estopped to deny the truth of all those allegations on which he's been criminally convicted by proof beyond a reasonable doubt. Your Honor, Mr. Arbid pled guilty to 18 U.S.C. 1341, one count of mail fraud. He did so under extenuating circumstances. And I would submit that the immigration judge also did not properly take into consideration and adequately consider the record in finding him guilty of a particularly serious crime. Mr. Arbid. Breyer, what more does he need? He knows from the nature of the statutory offense that he has been convicted of a crime of fraud involving more than $10,000. And as Judge Graber pointed out, the immigration judge looked at the nature of the scheme to defraud, saw that it involved substantially more than $10,000, and concluded on the basis of that evidence that it was a particularly serious crime. What more can the Board do in this case that has not already been done by the immigration judge? One of the primary factors in holding a Petitioner liable for a particularly serious crime is whether he is a danger to the community. This was a case involving fraud, and it was involving fraud against a financial institution. Mr. Arbid was basically coerced into participating in this scheme. He was lied to. He did not create the fraudulent documents that serve the basis of this transaction. Those were given to him by someone that is serving, that served substantially more time for these crimes than Mr. Arbid did. And all of these factors should have been taken into consideration in holding him accountable for particularly serious crimes for subject of withholding of removal. But our role in reviewing the determination of the agency is to determine whether or not substantial evidence supports the determination that the immigration judge and the Board made. We can look at the same record that the I.J. and the Board looked at, and in the view of this judge, there is substantial evidence to support that finding. So if that's our conclusion, by what authority do we remand and order something more be done? Again, I believe that this should be remanded under Delgado v. Holder, under Inouye v. Holder, under the Ninth Circuit decision Siu-Wa-Shee v. Holder, and I apologize if I'm mispronouncing those names. Those are all cases in which this Court We probably wouldn't know. Those are all cases in which this Court has held the BIA decision ambiguous, from which it could not conduct a meaningful review. But what's ambiguous? That's the problem I'm having is I know what those cases say, because apparently those panels had a problem with the record that was before them in determining exactly what had happened. Our record doesn't suffer from that problem. Well, for example, Your Honor, in Delgado, that's particularly telling in this case in that the petitioner in that case was convicted of three separate DUI felonies, which I would argue is potentially a danger to the community, you know, drunk driving. In this matter, the record will show that Mr. Arbid was potentially involved in three distinct fraudulent schemes. In Delgado, the Court held that the BIA decision was ambiguous because it could not tell whether the BIA took issue with one particular DUI offense or it was the culmination of all his actions, or if it was something underlying, there were some injuries involved in some of the accidents or jail time served. And I would submit that that's the exact same situation as in this matter. There's three separate fraudulent schemes. He only pled guilty of one. From the BIA decision, you can't tell if it's his actual guilty plea with which he's guilty of a particular serious crime or the fact that he may have been involved in more schemes, which ultimately he did not succeed in. I'm not sure what the legal significance is. If he's convicted of one scheme to defraud and the Court enters a finding that the amount of the loss to the victim, which your client actually personally received was $376,191.87, and we know that it was a scheme to defraud, what more does the immigration court and the Board need to do? Well, Your Honor, I would submit that that's exactly where there's confusion in the record and that my client didn't personally receive the $376,000. He testified that he was tricked into participating in this scheme by another person. All he got was some credit cards paid off. He received his car paid off, things of that nature. As far as what happened in this case. Wasn't there a restitution order that was entered against him in that amount? There was a restitution order, yes, Your Honor. Okay. I would also submit that this Court may reconsider Mr. Arbit's claim for deferral of removal as well. The BIA held that there was a fundamental change of country conditions in Lebanon during 2009 at the time of these immigration proceedings. And I submit that there has not been a fundamental change in country conditions in Lebanon, so that if this Court is ultimately unwilling to consider withholding of removal, it may reconsider a potential grant of deferral of removal. If I may, I would like to reserve the remainder of my time for rebuttal. Well, you may do that. Thank you. May it please the Court. My name is Kylie Kane. I'm appearing on behalf of the Attorney General. Your Honors, I'm not sure that I can add much more to the discussion regarding what Ms. Parker has raised here, whether there's appropriate analysis from the BIA's decision. I think you know our position is that the BIA's decision is sufficiently fleshed out. It's relying on an IJ decision which provides much more analysis and includes the Frantescu factors as modified by the Board's decision in matter of NAM, such that this Court sees that the IJ made the proper analysis under the factors as affirmed by this Court. So I'd actually, if Your Honors don't mind, would rather raise two other issues that I think are not sufficiently presented in the briefs given the change in law since the briefs have been filed. Now, that is the government's withdrawal of our argument that the so-called discretionary bar at the time that the briefs were written had barred this Court's review over particularly serious crime determinations. As Your Honors are aware from that 28J letter, we've withdrawn that argument. However, it is still the government's position that the Court in this particular case does not have jurisdiction over particularly serious crime determination because this particular alien is removable on the basis of his criminal offenses and, therefore, the so-called criminal alien bar, which is at 8 U.S.C. 1252a2c, would continue to bar this Court's review of any denial of asylum or withholding of removal. Now, that criminal bar is not going to bar this Court from reviewing the merits of his deferral of removal claim. This Court has case law that says that denial of deferral of removal is always a determination based on the merits, and the criminal alien bar does not, therefore, prohibit the Court from reviewing those determinations. However, I don't see why the criminal alien bar would not continue to prohibit the Court from reviewing the discretionary determination of whether Mr. Arbed's crimes constitute a particularly serious crime to bar his asylum or withholding of removal. Now, that we – that bar is mentioned in our brief on page 2 in our jurisdictional statement, but it wasn't the primary bar that was argued to review of this determination because, at the time, as I just mentioned, that the briefs were written, the discretionary bar was really what prohibited the Court from review of that particularly serious crime determination. So, therefore, that was what we were resting on. Well, now that that's no longer true because of the Enbag decision in Delgado, I just want to raise that the criminal alien bar, in the government's view, continues to prohibit the Court from reviewing that determination. Now, a related issue, if the Court does not agree with the government on that position, is what the standard of review should be should the Court review the particularly serious crime determination. Now, Judge Tallman, you just mentioned substantial evidence. I'm looking at the record to see whether the immigration judge's analysis is supported by the record. And, in fact, this Court, since the Delgado decision, has looked at some of these particularly serious crime determinations under that standard of review. However, the Court has also looked at it under an abuse of discretion review and has also looked at it under de novo review. So the government is submitting that. And I may mention, too, that my poison is abuse of discretion. I'd be happy to say why, but just as background, since the Delgado decision, there have been maybe half a dozen, maybe a dozen cases that have reviewed the merits of the particularly serious crime determination. They've all been unpublished, at least the ones that I found. And like I said, they've all kind of run the gambit of standards of review. None of them have taken it head on. So we don't really have an indication from the Court. None of them, in other words, have said, since Delgado, this is how we should look at these determinations. I'm pulling out the standard of review from the language the Court has used. So in some of them, they say substantial evidence doesn't support. In a few of them, they say there's been no abuse of discretion on that issue. And in some cases, because there was maybe an argument could be made that a legal issue had been raised, the Court looked at it de novo. So is it your position that we should use this case as a vehicle to publish an opinion to answer that question? I don't think so. And I'll tell you why. I mean, if I understood your position, you would probably prefer us to publish on the question whether the criminal alien Barr survives Delgado. I think that that's – that would be my preference. If the Court were to choose this case as a vehicle to say anything, my preference would be that the criminal alien Barr would continue to prohibit review in cases like these where the alien is removable. Now, I'll remind Your Honors that in Delgado, the alien was not removable based on his criminal offenses. That's why they didn't touch the criminal alien Barr. It just simply wasn't at issue in that case. It wasn't relevant. Exactly. It would not have prohibited the Court's review. That alien was removable because he overstayed his visa. So it just – it just wasn't an operation there like it is here. Now, getting back to the standard of review issue, the reason I think that the Court can sort of move around that issue, should it find that there's jurisdiction here, is to do what was done in this case called Bertrand v. Holder. It's an unpublished decision in August of 2011. And in that case, what the panel did was drop a footnote and said, even under the most permissive de novo standard of review, we find no error in the agency's determination. So therefore, and it even goes on to explicitly say, therefore, we don't need to articulate what the appropriate standard of review is in this case. Now, I would argue that that would be an appropriate thing for the Court to do here because we don't have briefing on the issue. And I know that Ms. Parker is a point of pro bono. I'm happy to provide briefing on why the government thinks that it's an abuse of discretion standard, but I don't want to put also an onerous burden on her. So what I hear you saying is you want us to conclude whatever the standard of review is, that there was no error in the agency's decision, and just leave it unspoken as to what the standard is? If it's a – if it's – if Your Honors don't think this is a close call, I – because the issue hasn't really been briefed, I don't know that – I don't – I mean, I would be happy with a published decision saying it was abuse of discretion. My office would love that. But I don't – I don't want to leave, Your Honors, without, you know, a vigorous debate about the issue. Neither party had briefed that issue, so I – Well, I mean, one thing we could do would be to offer the opportunity to file supplemental briefing on both sides. Yes. And then we could make a more intelligent decision if you think that would help. I would be happy to do that. Like I said, I just didn't want to be too aggressive with that because I know Ms. Parker is appointed by the Court. She's taking this case on pro bono. I'm happy to provide supplemental briefing on why abuse of discretion is the government's view of the standard of review here. I would be happy to do that. However, if you're going to find the criminal bar applies, maybe you don't reach standard of review at all because there's no review of the merits. There's no maybe about it. If we lack jurisdiction, we can't comment on what we would do if we had it. Right. And that would be my preference, of course. But I guess I'm speaking in the alternative, should you find that that bar doesn't prohibit review. Before you run out of time, would you comment on the question of changed conditions, the deferral issue, which is definitely before us? Yes. It is definitely before you, and we have a clear standard on that. It's substantial evidence. Here I think that the immigration judge, as affirmed by the board, is making the right three determinations on this issue as to why there's a change in country conditions. I will also say that there was another little hiccup with this. The immigration judge seemed to think that the burden was on the government to show changed country conditions for deferral, which was not true. So when it got to the board, the board uses the right language and says, actually, the burden, he didn't, Mr. Arba did not show that it's more likely than not that he would be tortured if removed to Lebanon with the consent or acquiescence of the Lebanese government. So that's on page 4 of the record in the board's decision. That is the correct legal standard that the burden would always be placed on the alien in deferral cases. Even in a case where termination is at issue, the burden stays with the alien to continue to show that he warrants this type of very limited protection from the government. So on the merits of that issue, the board affirmed the immigration judge's three determinations. That first, we know in 2005 that Syrian military troops disentangled themselves from the Lebanese government such that there was a troop withdrawal. That's a fundamental change that matters to Mr. Arba's case because that was the thing that he was protesting in the streets in the 90s when he was still in Lebanon. The second thing is the passage of time such that in the late 1990s when he was engaging in these political activities and sought refuge in the United States, he had a viable claim for withholding of removal under the CAAT at that time because the Syrian intelligence forces that knew of his activities and that had tortured him in the past still had him in their mind. Well, now we're 12 years on. Those troops have since left the country. So that's the second determination. And the third determination by the immigration judge, as upheld by the board, was that his political activities were of limited visibility in the country such that coupled with the passage of time, he doesn't have the same level of threat that he had when he was granted withholding of removal under the CAAT back in 2000. So those were the three determinations made by the immigration judge as affirmed by the board, and they're supported by not only the evidence that the Department of Homeland Security submitted, which were mostly State Department reports, but also even by the evidence that Mr. Arba submitted as rebuttal evidence showing that Syrian forces have withdrawn from Lebanon. And while there is still, of course, continuing violence in the country, including from Hezbollah, which the evidence shows is backed by Syria, that evidence just isn't strong enough to meet his burden to show a clear probability that he will be tortured if removed. And I'm saying if removed, but he's already in Lebanon, but if returned to the United States based on that. So he's already gone? Yes. Thank you, counsel. Thank you very much. Ms. Parker, you have some rebuttal time remaining. Yes, Your Honors. As far as the issues regarding the standard of review in the criminal bar for jurisdiction, those issues haven't been briefed before the Court. So if the Court is so inclined to publish a decision on those, I will. The criminal bar was raised in the answering brief. Yes. And then it was my understanding that the government was waiving their arguments regarding jurisdiction at all, so I did not believe that the Court was addressing that today. So to the extent that the Court is inclined to publish any opinions regarding jurisdiction or the standards of review, I would also request the opportunity to submit supplemental briefing. Regarding the deferral of removal and the claim and the three findings of the immigration judge, although Syria may officially have withdrawn from Lebanon in 2005, Hezbollah is still there, and Syria backs Hezbollah. There was an election in 2009 while these immigration proceedings were taking place. But wasn't it agents of the Syrian intelligence community who he testified arrested and tortured him in a Syrian-run jail? He did testify that it was agents of the Syrian intelligence. However, Syria backs Hezbollah, and for purposes of torturers and people inflicting harm upon the Christian population in Lebanon right now, I mean, they're virtually one and the same. There's still 57 Hezbollah parliament members that were elected in 2009. Hezbollah is an ongoing presence there. The conflict in Syria even today is pouring over into the Lebanese borders, and people are persecuted daily for their religious beliefs. It's primarily a Muslim country. He was involved in demonstrations, and while the immigration found those demonstrations in passing — I'm sorry. I see you, Madam. While he was involved in demonstrations, which immigration found to be limited, you know, this is Lebanon. You're not allowed to pass out flyers and start your religious beliefs in a regime like that. So I thank you very much for the Court's time today. Thank you. The case just argued is submitted. We thank both counsel for very thoughtful arguments, and in particular, we appreciate counsel participating in the pro bono representation project. It's a great help to the Court.
judges: Timlin, Graber, Tallman